UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| ROBERT ROCKWOOD, | : |
| --- | --- |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : File No. 1:16-cv-31-jgm |
|  | : |
|  | : |
| NANCY A. BERRYHILL, | : |
| Acting Commissioner of Social Security, | : |
|  | : |
| Defendant. | : |
|  | : |

MEMORANDUM AND ORDER
(Docs. 12, 15)

I.  Introduction

Plaintiff Robert Rockwood (Rockwood) brings this action under 42 U.S.C. § 1383(c)(3) of the Social Security Act, requesting review and reversal of the Commissioner of Social Security's (Commissioner) denial of his application for supplemental security income. Pending before the Court are Rockwood's motion seeking an order reversing the Commissioner's decision (Doc. 12 (Doc. 12-1 Memorandum)), and the Commissioner's motion seeking an order affirming her decision (Doc. 15). For the reasons set forth below, Rockwood's motion to reverse is denied and the Commissioner's motion to affirm is granted.

II.  Background

A.  Procedural

On May 3, 2013, Rockwood filed an application for disability insurance benefits and supplemental security income, alleging he became disabled as of January 1, 2003. (A.R. 263-73.) On July 2, 2013, his applications were denied, id. at 176-84, and on January 7, 2014, were denied again on reconsideration, id. at 190-207. Rockwood filed a timely request for an administrative hearing,

id. at 208-09, which was held by Administrative Law Judge ("ALJ") Matthew Levin on May 19, 2015, id. at 1-33. Rockwood appeared with an attorney at the hearing and testified. Id. On June 18, 2015, the ALJ issued a decision concluding Rockwood was not disabled from the amended alleged disability onset date of April 1, 2013. Id. at 34-62. The Appeals Council denied his timely request for review on December 18, 2015, and the ALJ's decision became the final decision of the Commissioner. Id. at 70-72.

In February 2016, Rockwood timely filed this action. (Docs. 1-3.) He raises three challenges to the ALJ's decision: (1) the ALJ erred in evaluating the medical opinions of his treating physicians; (2) the ALJ erred in his determination of Rockwood's residual functional capacity ("RFC"); and (3) the ALJ erred in relying on the vocational expert's testimony. (Doc. 12-1.)

B. Medical History

Rockwood was born April 18, 1963. (A.R. 265.) He has a high school education and past relevant work as a painter helper and drywall finisher. Id. at 5, 25, 53, 357. In 1987, Rockwood was injured in a high speed motor vehicle accident, suffering a loss of consciousness, and he thereafter suffered multiple head injuries that resulted in a loss of consciousness. Id. at 811. He also has HIV and untreated hepatitis C. Id. at 2129. He was incarcerated until early January 2013, and again from March 2014 until January 2015. Id. at 1200, 1636.

A January 2006 x-ray of Rockwood's spine revealed a compression fracture and evidence of degenerative disc disease and mild spondylosis in the lower lumbar spine. (A.R. 904.) An April 2009 MRI of his lumbar spine revealed a small central left disc herniation at L5-S1; mild to moderate spinal stenosis at L2-L3; and a slightly increased bulge at the L3-L4 level. Id. at 1620-21.

In March and May 2013, Rockwood saw Dr. Raiel Barlow, upon referral by his infectious disease doctor, Dr. Mary Ramundo, for his history of head injuries. (A.R. 930-45.) She listed his

2

current diagnoses as HIV positive, chronic pain, chronic hepatitis C, mixed anxiety depressive disorder, traumatic brain injury, and memory loss. Id. at 931, 935. At both visits, his range of motion was normal, he was alert with normal strength, coordination and gait, and, while he had a normal mood and affect in March, in May he was anxious and restless. Id. at 932, 936. Dr. Barlow recommended counseling, referring Rockwood to a psychologist, and for his chronic pain recommended physical therapy and prescribed Cymbalta. Id. at 933. She noted he was "not likely to be able to be successful at occupational functioning." Id. at 930.

On March 29, 2013, Rockwood saw Matthew Kraybill, Ph.D., upon referral by Dr. Barlow, for a neuropsychological evaluation. (A.R. 811-18.) Dr. Kraybill administered multiple tests. He listed diagnoses as concussion with loss of consciousness, major depressive disorder recurrent episode, and anxiety disorder. Id. at 818. His diagnostic interpretation included: "overall psychometric intellectual abilities are within the Moderately Impaired range;" "he is able to follow simple commands;" he "appears to do relatively well on non-verbal tasks that utilize his visual-spatial skills;" and "[b]asic motor speed and grip strength were [] within broad normal limits." Id. at 817. He opined: "Mr. Rockwood is demonstrating diffuse low scores across multiple domains of cognitive functioning . . . likely reflect[ing] longstanding difficulties related in part to his history of multiple head injuries as well as the deleterious effects of long-term polysubstance abuse, HIV, and HCV." Id. He concluded the "results of this evaluation suggest that despite good effort, Mr. Rockwood has mild to moderate neurocognitive deficits that would likely make successful occupational functioning very difficult or impossible." Id. at 818. He noted Rockwood was "emotionally overwhelmed" with transitioning to life out of prison. Id. Dr. Kraybill recommended therapy to manage his symptoms of depression and anxiety. Id.

3

Accordingly, in May, Rockwood saw Robertus Theisen, Ph.D., for psychotherapy. (A.R. 1363-64.) Dr. Theisen diagnosed adjustment disorder, mixed depression and anxiety, and history of polysubstance dependence. He noted Rockwood was dressed neatly and casually, distressed, and cooperative, with fair judgment, impaired recall and memory, and logical thinking. Id.

On June 6, 2013, Rockwood saw Dr. Ramundo, who had been treating him since at least 2000 for HIV. (A.R. at 962-67, 2129.) He complained of back pain and reported the Cymbalta helped initially but he had no further improvement. He stated he did not think he was depressed, and she noted his affect did not appear to be depressed and he was taking an antidepressant. On June 19, he saw Linda Perry, a licensed social worker, and complained he was having difficulty sleeping and of a rash he believed he may have gotten from helping a friend move. Id. at 1111.

In June, Rockwood also attended physical therapy. (A.R. 1075-81, 1117-19, 1124-26, 1136-37.) At evaluation, Rockwood had impaired strength, range of motion, and gait. Id. at 1137. The therapist noted he attended five sessions of therapeutic exercise, manual therapy, and aquatics. He appeared to have a slight improvement in pain and movement after three land therapy sessions but found two aquatic therapy sessions painful. Id. at 1136. Rockwood voluntarily ceased attending physical therapy because he was in too much pain. Id.

On July 2, Rockwood went to the police station threatening to resort to street drugs unless something was done to relieve his back pain and stress. (A.R. 1048.) The police took him to the emergency department where he saw Dr. Jon Sheeser. Rockwood stated he voluntarily ceased taking Cymbalta because of a rash but it could have been from mosquito bites suffered while camping. Id. Dr. Sheeser noted back pain, stiffness, and gait abnormalities but he could bear weight, stand and walk normally, and was fully oriented. Id. at 1049-50. He prescribed Atarax and Ambien and instructed him to restart Cymbalta. Id. at 1051.

4

During June, July, and August, Rockwood saw Dr. Theisen for continued psychotherapy. Dr. Theisen noted he was cooperative, alert and fully oriented with some memory problems but fair judgment. (A.R. 1351, 1357.) He occasionally expressed paranoid thinking and appeared one day early for one appointment. Id. at 1347. In August, he reported stabilized pain and agitation though he had to frequently stand during the session. Id. at 1335.

Also in July and August, as well as September, Rockwood saw Dr. Barlow and reported "significant improvement" in his back pain with Percocet and was able to help a friend on a construction project. (A.R. 1162.) She noted normal range of motion, movement, coordination and gait and he was alert with a brighter affect. Id. at 1161, 1164, 2064. He was sleeping better and had no more episodes of severe anxiety or anger. He continued to work on a friend's home renovation and was working on cars. Id. at 1159, 2066.

In September 2013, Rockwood continued psychotherapy with Dr. Theisen and saw an occupational therapist. Dr. Theisen noted his complaints were depression, anxiety, and paranoia and observed he was calmer and less agitated, not exhibiting paranoid behaviors, and had well-controlled pain. (A.R. 1330.) The occupational therapist noted no problems with his neuromusculoskeletal and movement related functions; though he was limited in some physical activity, it was related to chronic back pain. She stated he had no problems with basic activities of daily living and no problems with instrumental activities of daily living though he was struggling specifically with tracking appointments. Id. at 1289.

In October, Rockwood saw doctors at the Tilley Pain Clinic for left side low back pain and left leg pain. He reported his pain "negatively impacted level of function, resulting in a lower general activity level, a depressed mood, more difficulty walking, less social interaction, more difficulty performing normal work, less enjoyment of life, poor sleep and difficulty performing the

5

basic activities of daily living." (A.R. 1187.) His physical exam revealed he was alert, cooperative, and in no apparent distress, had normal gait, and had negative paraspinal tenderness. Id. at 1189-90.

On October 10, Rockwood saw Dr. Ramundo for reevaluation of his HIV and chronic hepatitis C. He reported he was depressed and disappointed he could not move to live with his girlfriend because his probation would not be transferred and was taking his HIV medications consistently. (A.R. 1299.) She noted he has had no opportunistic infection and his last blood work had an undetectable viral load. Id. at 1301. Regarding his chronic pain, she noted he had stopped taking his Neurontin for "unclear reasons," and that his pain is under better control. Id. at 1302.

On October 14, Rockwood saw Dr. Theisen and reported he was moving to Brattleboro. Dr. Theisen noted he was somewhat restless but relatively stable and maintaining an appropriate routine. (A.R. 1325.) He recommended Rockwood see a therapist after his relocation. Id.

In November and January, Rockwood saw Dr. Barlow, reporting his pain had significantly improved with use of Percocet, he was not taking Neurontin (gabapentin) because it was not effective, on Cymbalta his mood remained stable and his sleep was improved, and he did not follow up with occupational therapy. (A.R. 2057-58.) Between his visits, he reduced his use of Percocet from 6-7 tablets a day to 3-4. Id. at 2051, 2057. His physical exams revealed he was in no distress, had normal range of motion, though tenderness on palpation of left paraspinals, he was alert with normal movement, coordination and gait, and his affect was normal. Id. at 2053, 2059.

In January 2014, Rockwood saw Dr. Theisen and reported his pain was well-managed. Dr. Theisen noted he was calm and less angry, did not appear to have serious depression or anxiety, and had no paranoid or overly suspicious thinking. (A.R. 2028.)

On February 14, Rockwood saw Dr. Ramundo for reevaluation of his HIV and chronic hepatitis C. He was very angry, depressed with his situation, and frustrated but had no acute

6

physical complaints. His back pain continued but was better on Percocet. She noted he had no opportunistic infection and his December blood work had an undetectable viral load. He was not cooperative for a physical exam and had a depressed affect. (A.R. 1645-47.)

On February 17, Rockwood saw Dr. Barlow and reported his pain "remained significantly improved" and his mood had been stable on Cymbalta and Lyrica, but his sleep was poor; he indicated he was not interested in a referral to a sleep center. On exam, he had normal range of motion with tenderness on palpation of left paraspinals, was alert, and had normal movement, coordination, and gait. (A.R. 2044-46.)

A March 11 drug test was positive for cocaine and opiates and his initial evaluation at the Department of Corrections noted he reported good sleep and appetite, and denied mental health history and illicit drug or alcohol use, though admitted to using alcohol and street drugs recently in his intake form. His appearance, speech, mood, and behavior were appropriate, affect was blunted, thoughts were coherent and appropriate, he was oriented to person, place, purpose, and time, and memory, insight, and judgment were intact.. (A.R. 1800-02, 1928, 1942.) He was struggling with acute detox symptoms and had been drinking regularly for awhile. Id. at 1806. His records show he often refused or missed medication while he was incarcerated, id. at 1728-1763, 1834, 1838, 1841-47, 1853-60, 1866-70, 1873-97, and he refused to meet with a psychiatric provider, id. at 1931-32. His physical exams revealed his HIV in good control with no detectable viral load or opportunistic infections and, despite his chronic back pain, he was fully functional. Id. at 1714-15, 1721-22, 1725, 1776. He reported, in March, back pain but he was fully functional, id. at 1723, in June, he was doing generally well with no complaints, id. at 1720, in September, no complaints, id. at 1716, and in November, doing generally well with no acute issues, id. at 1712.

On January 9, 2015, Rockwood saw Dr. Ramundo for reevaluation of HIV and chronic hepatits C. She noted he was released from prison the day before and had no acute illnesses while incarcerated. (A.R. 1636.) He saw a social worker who noted he was frustrated and tired. Id. at 1640. He also saw Dr. Barlow and told her he did not take any prescription medication while incarcerated. Id. at 2033. His physical exam revealed he was uncomfortable, frequently changing positions, normal range of motion with tenderness on palpation of left paraspinal, alert, and normal movements, coordination, and gait. She prescribed a fentanyl patch, Cymbalta, Lyrica, and Ambien. Id. at 2035. Rockwood followed up with Dr. Ramundo on January 21, reporting he restarted Lyrica, the Ambien was ineffective, discontinued the fentanyl patches because he did not tolerate them, and never filled the Cymbalta prescription. In consultation with Dr. Barlow, she prescribed and gave him Percocet to manage his pain. Id. at 2167.

In late January and February, Rockwood saw Dr. Theisen. In January, he reported feeling overwhelmed and paranoid but was doing better by February, in a better mood, more hopeful and less paranoid. Dr. Theisen's diagnostic impression was adjustment disorder, mixed depression and anxiety, history of polysubstance dependence, and amnestic disorder due to head trauma. (A.R. 2024, 2026.)

In February, Rockwood began seeing Dr. Aaron Reiter, a primary care physician. Upon examination, Rockwood was oriented to person, place and time, not in distress but poorly kempt, with normal mood, affect, behavior, judgment, and thought content. (A.R. 2136-37). Rockwood completed a questionnaire indicating his hobbies were fishing and hunting, he did not need assistance with language or moving about, had no balance problems, and he exercised 1-2 times per week for up to fifteen minutes at a moderate to vigorous pace. Id. at 2141-42.. He also signed an agreement for using controlled substances. Id. at 2139-40.

In March, Rockwood saw Dr. Barlow reporting he was doing relatively well, attending AA regularly and volunteering at church, and his back pain was at a tolerable level. Upon examination, he had normal range of motion, normal movements, coordination, and gait, and was alert with a brighter affect. (A.R. 2173-76.) On March 26, Rockwood went to the emergency room after a fall off a bucket while "doing some work for a side job" complaining of rib pain and denying back pain. An x-ray was negative for rib fracture. He was alert, oriented to person, place and time, was active and cooperative, was not in distress, had discomfort with certain movements, and had normal mood, speech, behavior, judgment, and thought content. Id. at 2156-61.

On April 3, Rockwood saw a Nurse Practitioner to follow up regarding his rib pain. He requested and received a lidocaine patch prescription because he used a friend's and found it useful and also requested oxycontin pain medication for his back and received hydrocodone-acetaminophen. (A.R. 2185-88.) On April 9, he saw Dr. Reiter who re-reviewed narcotic policy and noted he would refill his prescription but likely would not continue narcotics because of their poor efficacy for chronic back pain. Id. at 2180-82.

C.     Medical Opinions

In July 2013, state agency consultant Dr. Elizabeth White opined Rockwood had exertional and postural limitations: he could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand, walk and sit for six hours; unlimited push/pull with hands and feet; frequently climb ladders, ropes, and scaffolds; frequently stoop; unlimited balancing, kneeling, crouching, and crawling; avoid concentrated exposure to extreme cold and hazards; avoid even moderate exposure to vibration. (A.R. 121-22.) She opined Rockwood had no manipulative, visual, communicative, or environmental limitations. Id.

9

In July 2013, state agency consultant Howard Goldberg, Ph.D., opined Rockwood had understanding and memory limitations of moderately limited ability to understand and remember detailed instructions but he retained the capacity for 1-2 step instructions and sustained concentration and persistence limitations of moderately limited ability to carry out detailed instructions, moderately limited in ability to maintain attention and concentration for extended periods, and moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. Dr. Goldberg opined Rockwood was restricted from timed or productivity standards but in a low stress environment with social limitations he retained the capacity to carry out 1-2 step tasks over an eight-hour day throughout the workweek. (A.R. 122-23.)

In September 2013, Dr. Ramundo wrote a letter detailing her treatment of Rockwood since at least 2000. She noted he had never had an opportunistic infection and had done well on his medication for HIV. She noted his untreated chronic active hepatitis C. She opined: "Although I see him for his HIV disease and his chronic HCV infection I believe that his depression/anxiety, his chronic pain, and his neuropsychological dysfunction (following a traumatic brain injury) are the major issues that interfere with his ability to function." (A.R. 1182.)

Also in September 2013, Dr. Barlow wrote a letter noting Rockwood's history of traumatic brain injury, polysubstance abuse, chronic pain, HCV, HIV, and symptoms of depression and anxiety. She stated the results of his neuropsychological evaluation reveal his intellectual abilities are within the moderately impaired range. She opined his neurocognitive deficits "would likely make successful occupational functioning very difficult to impossible." (A.R. 1184.)

In January 2014, state agency consultant Dr. Edward Schwartzreich, opined Rockwood had understanding and memory limitations of moderately limited ability to understand and remember

10

detailed instructions but he retained the memory/comprehension for 1-2 step instructions and sustained concentration and persistence limitations of moderately limited ability to carry out detailed instructions, and moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (A.R. 166-67.) Regarding social limitations, Rockwood was moderately limited in his ability to interact appropriately with the general public and in his ability to accept instructions and respond appropriately to criticism from supervisors. Id. at 167. Dr. Schwartzreich opined Rockwood's chronic cognitive difficulties and adjustment disorder with mixed features limit him but he retains the ability for 1-2 step tasks for two hours over an eight-hour period through a forty-hour week though he will occasionally need additional supports if he became discouraged or angry. Further, Rockwood ought not work primarily with the public and may need calm repetitions of instructions at times, and equally calm criticisms when needed. Id.

On January 9, 2015, Dr. Ramundo noted, on a training and employment medical report for general assistance and 3SquaresVT, Rockwood's AIDS, chronic active hepatitis C, and chronic back pain were controlled with medications and his history of traumatic brain injury and formal neuropsych testing but did not check the box that he was unable to work. (A.R. at 1502.) On the same date, Dr. Barlow wrote a one-sentence letter opining Rockwood "is unable to work at any time of employment due to cognitive impairment following traumatic brain injury as well ans [sic] chronic back pain." Id. at 1503. On January 13, Dr. Ramundo wrote a letter substantially similar to her September 2013 letter, id. at 1182, regarding his medical conditions, noting he has trouble maintaining attention and functioning in usual daily activities, and opining "I cannot imagine him being able to be successful in a work setting." Id. at 2129-30.

On March 31, 2015, Dr. Theisen completed a medical source statement of ability to do work-related activities. He opined Rockwood had generally persistent anxiety accompanied by

11

motor tension, apprehensive expectation, and vigilance and scanning; depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, hallucinations, delusions or paranoid thinking; and an organic mental disorder demonstrated by persistent disorientation to time, memory impairment, perceptual or thinking disturbances, disturbance in mood, emotional lability and impairment in impulse control, and loss of measured intellectual ability of at least 15 points or overall impairment index clearly within the severely impaired range on neuropsychological testing. He opined Rockwood had marked restrictions in activities of daily living, difficulty in maintaining social functioning, difficulties in maintaining concentration, persistence or pace, difficulty completing tasks in a timely fashion, and had experienced three episodes of decompensation of an extended duration. He would expect Rockwood to cease to function effectively when receiving criticism from supervisors and experiencing conflicts with coworkers and to have difficulty responding appropriately to coworkers, supervisors, general public and changes in work setting, noting he has a history of paranoia/distrust and is quick to have angry outbursts, and expecting incidents to occur five times a week. Rockwood would not be able to focus and concentrate for two-hour periods of time during an eight-hour workday and would be absent from work several times a week. (A.R. 2150-55.)

On May 11, Dr Barlow completed medical source statements of ability to do work related activities. She opined Rockwood had extreme limitations. He did not have the ability to concentrate and focus on job-related tasks for continuous two-hour periods consistently, his impairments would interfere with his ability to complete job-related tasks, his pace would be more than 20% reduced, and he would need more than ordinary breaks. Rockwood had no disorder of the spine resulting in a compromise of a nerve root or spinal cord, no spinal arachnoiditis, no

12

lumbar spinal stenosis, and no inability to ambulate effectively. She did not complete the exertional or manipulative limitations, work absences, and side effects of medications sections. She opined Rockwood is not able to function effectively in a workplace environment. (A.R. 2189-94.) With regard to mental capabilities, Dr. Barlow did not complete the first two pages but opined Rockwood has an organic mental disorder demonstrated by persistent memory impairment, disturbance in mood, and emotional lability. He had marked restrictions in activities of daily living and difficulty in maintaining social functioning, and extreme difficulties in maintaining concentration, persistence or pace and difficulty complete tasks in a timely manner. She did not indicate any episodes of decompensation. She opined his mental illness would cause him to cease to function effectively when receiving criticism from supervisors and experiencing conflicts with coworkers and difficulty responding appropriately to coworkers, supervisors, general public, and changes to work setting. He would be unable to meet deadlines and could not focus and concentrate on job tasks for two-hour periods. He would be absent from work because of his impairments but she did not indicate how often. She supported her opinion by referencing Rockwood's 2013 neuropsych testing. (A.R. 2195-2200.)

    D.    <u>Hearing Testimony</u>

At the hearing, a vocational expert testified that someone with limitations consistent with Rockwood's limitations as determined in the RFC would be unable to perform Rockwood's past relevant work but could perform the jobs of office cleaner, price marker, and greenhouse worker--jobs that existed in significant in numbers nationally and regionally. (A.R. 26-28.)

III.    <u>Standard of Review</u>

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

13

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The Commissioner uses a five-step sequential process to evaluate disability claims. Butts v. Barnhart, 388 F.3d 377, 380-81 (2d Cir. 2004). At the first step, the ALJ determines whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not, the ALJ determines whether the claimant has a "severe impairment." Id. §§ 404.1520(c), 416.920(c). If the ALJ finds the claimant has a severe impairment, the third step requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. §§ 404.1520(d), 416.920(d). A claimant is presumptively disabled if the impairment meets or equals a listed impairment. Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work." Id. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, Butts, 388 F.2d at 383, and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

14

In reviewing the Commissioner's disability decision, the court limits its inquiry to a "plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such a decision. 42 U.S.C. § 405(g). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Poupore, 566 F.3d at 305 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Commissioner, as the trier of fact, resolves evidentiary conflicts and assesses credibility. See Richardson, 402 U.S. at 399. Under this "very deferential standard of review," once an ALJ has found facts, a court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." Brault v. Commissioner, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and citation omitted); 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").

IV. Discussion

Rockwood asserts the ALJ erred in evaluating the medical opinions of his treating physicians, in his determination of Rockwood's RFC, and in relying on the vocational expert's testimony. (Doc. 12-1.) The Commissioner contends that substantial evidence supports the ALJ's determinations and credibility assessment. (Doc. 15.)

The ALJ found Rockwood met the insured status requirements through March 31, 2003, had not engaged in substantial gainful activity since April 1, 2013, the amended alleged onset date, and had severe impairments of degenerative disc disease, depression, anxiety, and a cognitive disorder

status post traumatic brain injury. (A.R. 40.) He noted he also considered Rockwood's HIV, polysubstance abuse, and chronic liver disease but found those conditions to be nonsevere. Id. The ALJ found Rockwood did not have an impairment or combination of impairments that met or equaled a listed impairment. Id. at 41-43. The ALJ determined Rockwood retained the residual functional capacity to perform light work except:

> he must avoid all ladders, ropes, or scaffolds but could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, is limited to simple unskilled work and should avoid social interaction with the general public but can sustain brief and superficial social interaction with co-workers and supervisors.

Id. at 43. While the ALJ determined Rockwood was unable to perform his past relevant work, considering his age, education, work experience, and RFC, he found he is capable of making a successful adjustment to other jobs existing in significant numbers in the national economy. Id. at 53-54. Accordingly, he found he was not disabled under the Social Security Act from April 1, 2013. Id. at 55.

Rockwood argues the ALJ erred by giving little weight to the opinions of his treating physicians, specifically Drs. Barlow, Theisen, Ramundo, and Kraybill. (Doc. 12-1 at 8-20.) Though Dr. Barlow is a medically acceptable treating source within the meaning of the Social Security Act, Kohler v. Astrue, 546 F.3d 260, 268 (2d Cir. 2008), the ALJ did not accord her opinions controlling weight. (A.R. 49-50.) The decision demonstrates he thoroughly reviewed her medical notes. (A.R. 44-47.) He afforded her opinions regarding Rockwood's physical limitations very little weight because her opinions were those of a primary care source and not of a specialist such as an orthopedist, she failed to provide a function-by-function assessment of Rockwood's capabilities, and her treatment notes fail to support the substantial limitations she ascribed to him in her opinions. Id. at 49-50. The ALJ afforded Dr. Barlow's opinions regarding Rockwood's mental limitations no weight because she is a primary care source lacking expertise in mental impairments, Rockwood's

treatment records with Dr. Barlow often show his prescribed medication worked well to manage his symptoms, and her notes and his activities do not support the substantial limitations she ascribed to him, particularly the treatment notes consistently note normal affect. Id. at 51-52.

The ALJ did not accord Dr. Theisen's opinions controlling weight. (A.R. 50-51.) The decision demonstrates he thoroughly reviewed his medical notes. Id. at 44-47. The ALJ afforded his opinions regarding Rockwood's mental limitations little weight because his treatment was interrupted by Rockwood's incarceration for a substantial portion of the time under review and his treatment notes regularly fail to provide specific objective mental status examinations and do not contain support for the listing-level limitations he ascribes to Rockwood. Id. at 50-51. The Court also notes Rockwood's medical history and the opinion of his primary care physician, Dr. Barlow, do not reveal any instances of decompensation which is inconsistent with Dr. Theisen's opinion that Rockwood had experienced three episodes of extended duration.

The ALJ did not accord Dr. Ramundo's opinions controlling weight. (A.R. 48-49.) The decision demonstrates he thoroughly reviewed her medical notes. Id. at 44-47. He afforded her opinions regarding Rockwood's limitations limited weight because she treats Rockwood's HIV and hepatitis C, neither of which she opines is a disabling impairment, and she is not a specialist in the conditions for which she did not treat claimant that she opines affect his functioning, she did not provide a function-by-function assessment of Rockwood's capabilities, and she did not support her opinions with citations to her objective observations, any testing, or any objective metrics. Id. at 48-49.

Lastly, the ALJ did not accord Dr. Kraybill's evaluation controlling weight. (A.R. 52-53.) The decision demonstrates he thoroughly reviewed the findings of the neuropsychological evaluation. Id. at 52. He afforded the evaluation little weight because, though he is a specialist, he

17

saw Rockwood only once and it was shortly after his release from several years' incarceration, i.e., at a time of considerable stress, the objective testing generally supports mild to moderate limitation which is inconsistent with Dr. Kraybill's conclusory assertion Rockwood is disabled, a determination reserved to the Commissioner in any case, his opinion was inconsistent with other providers' treatment notes showing no ongoing functional cognitive limitations and with Rockwood's activities. Id. at 52-53.

As detailed above, the ALJ thoroughly reviewed Rockwood's medical history and treatment notes of his providers and determined their opinions were not entitled to controlling weight for specific reasons. Inconsistency with other substantial evidence is a proper ground for not giving a treating source's opinion controlling weight. See Clark v. Comm'r, 143 F.3d 115 (2d Cir. 1998); 20 C.F.R. § 404.1527(d). Accordingly, the Court cannot conclude the ALJ erred by giving little or no weight to the opinions of Drs. Barlow, Theisen, Ramundo, and Kraybill.

Rockwood also challenges the ALJ's failure, in determining his RFC, to consider the disruption to work routine that would be caused by his medical treatment, arguing his appointments would lead to more than one absence per month, the maximum acceptable absentee rate per the vocational expert. (A.R. 20-22.) The Court cannot conclude the ALJ's failure to include expected absences in the RFC determination was in error. The record demonstrates Rockwood was able to schedule appointments on the same day, for example, he saw Drs. Ramundo and Barlow both on January 9, 2015, and he voluntarily ceased attending physical therapy appointments, the only treatment appointments he attended more frequently than once per month. The ALJ determined Rockwood's RFC after a thorough review of the objective medical evidence. See A.R. 43-53. Given all the evidence before him, the ALJ's determination of Rockwood's residual functional capacity, will not be overturned as it is supported by substantial evidence.

Lastly, Rockwood challenges the ALJ's failure to include a specific finding on his impaired fine motor skills, slow processing speed, and impaired executive functioning. (Doc. 12-1 at 22.) Specifically, failing to include these impaired functions led to the vocational expert identifying jobs requiring frequent handling and fingering, functions Rockwood could not perform due to his impairments. Id. As discussed above, the ALJ afforded Dr. Kraybill's evaluation little weight and that determination was not in error. Rockwood's medical history does not reveal limitations in his ability to handle or finger. Further, Dr. White opined Rockwood had no manipulative limitations. The Court cannot conclude the ALJ's determination not to include impairments related to fine motor skills, slow processing speed, and impaired executive functioning, or specifically impairments in handling and fingering, was in error.

Given the evidence before him, the ALJ's ultimate finding that Rockwood was not disabled, i.e., unable to engage in any substantial gainful activity because of an impairment expected to last more than a year, from the alleged onset date of April 2013, is supported by substantial evidence.

V.     Conclusion

Substantial evidence supports the ALJ's decision. Accordingly, Rockwood's motion for an order reversing the decision of the Commissioner (Doc. 12) is DENIED. The Commissioner's motion seeking an order affirming her decision (Doc. 15) is GRANTED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 17th day of April, 2017.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge